**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KATHARINE BUSH, *et al*., on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | CIVIL ACTION NO. 1:10-cv-01721 |
| v. | |
| RUTH'S CHRIS STEAK HOUSE, INC., *et al.* | JUDGE BARBARA JACOBS ROTHSTEIN |
| Defendants. | |

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

The decision of the Sixth Circuit Court of Appeals in *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, No. 10-4188 (July 18, 2013), issued the day after Plaintiffs filed their Reply in Support of Their Motion for Class Certification and Appointment of Class Counsel (Dkt. No. 113), supports Plaintiffs' analysis that the proposed class satisfies the requirements for certification established by Federal Rule of Civil Procedure 23(a)(2) ("commonality") and 23(b)(3) ("predominance").  It also supports Plaintiffs' motion to strike Defendants' draft summary judgment motions.  A copy of the decision is attached to this filing.

To begin, *Whirlpool* makes clear "that there need be only one common question to certify a class."  Slip op. at 16.

RCSH argues against commonality because its implementation of some of its policies varied to some extent over time and by position.  Dkt. No. 89, at 2, 37.  Plaintiffs reply that their claims nonetheless raise common issues because the flaws in the implementation of RCSH's policies were the same despite those minor variations in implementation.  Dkt. No. 113, at 7.  *Whirlpool* supports Plaintiffs' reply.  The company argued that there was no commonality

because its washing machines "were built over a period of years on two different platforms, resulting in the production of twenty-one different models during the relevant time frame." Slip op. at 17. The Sixth Circuit pointed out these differences were relatively minor, but more important, "the common question of whether design defects cause mold growth remains across the manufacturing spectrum Whirlpool describes." *Id.*; *see also id.* at 19 (distinguishing *In re Am. Med. Sys.*, 75 F.3d 1069, 1080-81 (6th Cir. 1996) "because plaintiffs [in that case] did not allege any particular defect common to all plaintiffs"). If the defect is the same, minor differences in implementation do not defeat commonality.

RCSH also contends that the different jobs held by proposed class members, and the fact that some class members do not believe that they have suffered gender discrimination, undercut commonality. Dkt. No. 89, at 38 & n.28. *Whirlpool* rejects similar arguments. It did not matter that laundry habits differed by household because "the mold problem occurred despite variations in consumer laundry habits and despite remedial efforts undertaken by consumers and service technicians to ameliorate the mold problem." Slip op. at 18. Similarly, it did not matter to class certification that some class members were satisfied with their machines. *Id.* at 19-20 (citing *Daffin v. Ford Motor Co.*, 458 F.3d 549, 550 (6th Cir. 2006)).

Turning to Rule 23(b)(3), RCSH suggests that, as in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), "questions of individual damage calculations will inevitably overwhelm questions common to the class." Dkt. No. 89, at 54. The defendant in *Whirlpool* made the same argument, which the Sixth Circuit rejected. "Where determinations on liability and damages have been bifurcated, *see* Fed. R. Civ. P. 23(c)(4), the decision in *Comcast*—to reject certification of a liability and damages class because plaintiffs failed to establish that damages could be measured on a classwide basis—has limited application." Slip op. at 27. Admittedly,

because the *Teamsters* process has not been extended to consumer class actions, the district court in *Whirlpool* had reserved damages for individual determination.  *Id.* at 2.  Nonetheless, the holding in *Whirlpool* applies as well in this case:  *Comcast* "has limited application" when damages will be decided individually under the *Teamsters* rubric and there will not be an unmanageably large number of individual determinations because of the modest size of the proposed class.

Finally, the Sixth Circuit provides guidance as to RCSH's attempts to introduce draft summary judgment motions in opposition to class certification.  In *Whirlpool*, the appellate court emphasized the language from the Supreme Court in *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied" (slip op. at 13) and added that "district courts may not 'turn the class certification proceedings into a dress rehearsal for the trial on the merits.'"  *Id.* (citing *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012)).

Dated:  July 19, 2013                          Respectfully submitted,

  /s/ Cyrus Mehri_____
Hassan A. Zavareei, D.C. Bar No. 456161
Andrea R. Gold, D.C. Bar No. 502607
TYCKO & ZAVAREEI LLP
2000 L Street NW, Suite 808
Washington, DC 20036
Telephone: 202/973-0900
Facsimile: 202/973-0950
hzavareei@tzlegal.com
agold@tzlegal.com

Cyrus Mehri, D.C. Bar No. 420970
Janell Byrd, D.C. Bar No. 376609
Michael Lieder, D.C. Bar No. 444273
Taryn Wilgus Null, D.C. Bar No. 9857245
MEHRI & SKALET PLLC
1250 Connecticut Avenue NW, Suite 300
Washington, DC 20036
Telephone: 202/822-5100
Facsimile: 202/822-4997
cmehri@findjustice.com
jbyrd@findjustice.com
*Attorneys for Plaintiffs*

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0180p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re: WHIRLPOOL CORPORATION
FRONT-LOADING WASHER PRODUCTS
LIABILITY LITIGATION.

_____

GINA GLAZER, Individually and on behalf of
all others similarly situated; TRINA ALLISON,
Individually and on behalf of all others
similarly situated,

*Plaintiffs-Appellees,*

*v.*

WHIRLPOOL CORPORATION,

*Defendant-Appellant.*

No. 10-4188

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 08-wp-65000—James S. Gwin, District Judge.

Argued: January 12, 2012

Decided and Filed: July 18, 2013

Before: MARTIN and STRANCH, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Malcolm E. Wheeler, WHEELER TRIGG O'DONNELL LLP, Denver, Colorado, for Appellant. Jonathan D. Selbin, LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, New York, New York, for Appellees. **ON BRIEF:** Malcolm E. Wheeler, Michael T. Williams, Galen D. Bellamy, Joel S. Neckers, WHEELER TRIGG O'DONNELL LLP, Denver, Colorado, F. Daniel Balmert, Anthony J. O'Malley,

_____

[*] The Honorable Cornelia G. Kennedy, a member of the panel, retired in 2012 while this case was pending in the Supreme Court. This decision is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d). *See United States v. Sandlin*, 313 F.3d 351, 352 (6th Cir. 2002) (per curiam); *In re Vertrue Inc. Mktg. and Sales Practices Litig.*, No. 10-3928, 2013 WL 1607295 (6th Cir. Apr. 16, 2013); *Cambio Health Solutions, LLC v. Reardon*, 234 F. App'x 331, 333 (6th Cir. 2007); *Lewis v. Caterpillar, Inc.*, No. 94-5253, 1998 WL 416022 (6th Cir. July 9, 1998).

1

VORYS, SATER, SEYMOUR AND PEASE LLP, Cleveland, Ohio, for Appellant. Jonathan D. Selbin, Jason L. Lichtman, LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, New York, New York, for Appellees. John H. Beisner, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Washington, D.C., for Amicus Curiae.

————————————

## OPINION

————————————

JANE B. STRANCH, Circuit Judge.  Gina Glazer and Trina Allison filed a class action lawsuit on behalf of Ohio consumers against Whirlpool Corporation alleging that design defects in Whirlpool's Duet®, Duet HT®, Duet Sport®, and Duet Sport HT® front-loading washing machines (the Duets) allow mold and mildew to grow in the machines, leading to ruined laundry and malodorous homes.  This suit and similar suits filed against Whirlpool in other jurisdictions are consolidated in multi-district litigation managed by the district court in the Northern District of Ohio.

The district court certified a liability class under Federal Rules of Civil Procedure 23(a) and (b)(3) comprised of current Ohio residents who purchased one of the specified Duets in Ohio primarily for personal, family, or household purposes and not for resale, and who bring legal claims for tortious breach of warranty, negligent design, and negligent failure to warn.  Proof of damages is reserved for individual determination. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, No. 1:08–WP–65000, 2010 WL 2756947, at *4 (N.D. Ohio July 12, 2010).  We granted Whirlpool's request to pursue an interlocutory appeal of the class certification decision, Fed. R. Civ. P. 23(f), and we affirmed the district court's opinion and order.  *Glazer v. Whirlpool Corp.*, 678 F.3d 409, 421 (6th Cir. 2012).  We denied Whirlpool's petition for rehearing by the panel and for rehearing en banc.  Whirlpool filed a petition for a writ of certiorari.

The Supreme Court granted Whirlpool's petition, vacated our prior judgment, and remanded the case to this court for further consideration. *Whirlpool Corp. v. Glazer*, 133 S. Ct. 1722 (2013) (mem.).  The Supreme Court's order—known as a grant, vacate, and remand order (GVR)—directed us to reconsider the appeal in light of *Comcast Corp.*

*v. Behrend*, 133 S. Ct. 1426 (2013).  *See Lawrence v. Chater*, 516 U.S. 163, 165–66 (1996) (per curiam).  After reconsideration, and for the reasons set forth below, we AFFIRM the order of the district court certifying a liability class.

## I.  MOTION TO REMAND

Before returning to the merits of this appeal, we pause briefly to address Whirlpool's motion requesting that the case be remanded so the district court may consider in the first instance whether *Comcast Corp.* affects the class certification decision.  Contrary to Whirlpool's suggestion that the GVR order constitutes a merits determination in its favor, our law is clear that a GVR order does not necessarily imply that the Supreme Court has in mind a different result in the case, nor does it suggest that our prior decision was erroneous.  *See Cmtys. For Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 680 (6th Cir. 2006) (adhering to original decision).  The GVR order is not equivalent to reversal on the merits, *Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001); *Henry v. City of Rock Hill*, 376 U.S. 776, 777 (1964), nor is it "an invitation to reverse." *Gonzalez v. Justices of the Mun. Court of Boston*, 420 F.3d 5, 7 (1st Cir.  2005).  We must simply determine whether our original decision to affirm the class certification order was correct or whether *Comcast Corp.* compels a different resolution.  *See Cmtys. For Equity*, 459 F.3d at 680–81; *Kenemore v. Roy*, 690 F.3d 639, 642 (5th Cir. 2012).

The cases Whirlpool cites in support of its motion do not persuade us to remand the case to the district court.  In *Clark v. Chrysler Corp.*, 80 F. App'x 453, 454 (6th Cir. 2003), the issue on remand from the Supreme Court was whether a punitive damages award violated the defendant's due process rights in light of *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).  Whether to grant or deny a motion for remittitur is a discretionary decision for the district court to make and explain after that court has carefully reviewed the trial evidence to determine whether the jury verdict was excessive.  *See Sykes v. Anderson*, 625 F.3d 294, 322 (6th Cir. 2010).  In that situation it was appropriate for this court to remand the case so that the district court could have the first opportunity to reconsider the damages award.

In *United States v. Rapanos*, 16 F. App'x 345 (6th Cir. 2001), a defendant was convicted of filling wetlands in violation of the Clean Water Act (CWA).  After the Supreme Court decided that the Army Corps of Engineers exceeded its authority in promulgating a pertinent regulation under the CWA, *Solid Waste Agency of N. Cook Cnty. v. United States Army Corps of Eng'rs*, 531 U.S. 159 (2001), this court received a GVR order in *Rapanos* directing reconsideration of that case in light of *Solid Waste Agency*.  *Rapanos v. United States*, 533 U.S. 913 (2001) (mem.).  This court appropriately remanded the case to the district court to evaluate in the first instance whether *Solid Waste Agency* undermined the foundation of the criminal indictment. *Rapanos*, 16 F. App'x 345.

In *Messer v. Curci*, 881 F.2d 219, 220 (6th Cir. 1989) (en banc), this court held that an "allegation of political patronage hiring, standing alone, does not state a claim for violation of 42 U.S.C. § 1983" and affirmed a judgment dismissing the complaint. The Supreme Court issued a GVR order, *Messer v. Curci*, 497 U.S. 1001 (1990) (mem.), directing reconsideration in light of *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990), which held that employment actions based on political affiliation or support impermissibly infringed the First Amendment rights of public employees.  Because the *Messer* complaint had been dismissed erroneously, the court immediately remanded the case to the district court to permit the lawsuit to proceed.  *Messer v. Curci*, 908 F.2d 103 (6th Cir. 1990).  Finally, *United States v. Schmucker*, 766 F.2d 1582, 1583 (6th Cir. 1985), did not involve an interlocutory appeal of a class certification order, and *Kappos v. Hyatt*, 132 S. Ct. 1690 (2012), is distinguishable because that case concerned the procedure for introducing new evidence in district court when a party challenges a patent decision made by the Patent and Trademark Office.

In contrast to the cases cited by Whirlpool, the present GVR order requires us to consider only whether *Comcast Corp.* has any effect on our Rule 23 analysis affirming the district court's  certification of a liability class.  We undertake the task assigned to us, *see Cmtys. For Equity*, 459 F.3d at 680, deny the motion to remand, *see Addo v. Attorney Gen.*, 355 F. App'x 672, 674–75 (3d Cir. 2009) (denying party's motion to

remand to district court after receipt of GVR order), and provide our comprehensive analysis of this case.

## II. FACTS

The named plaintiffs, Gina Glazer and Trina Allison, are Ohio residents. Whirlpool is a Delaware corporation with its principal place of business in Michigan.

Whirlpool began manufacturing Duets in 2002. The plaintiffs' causes of action rest on the central allegation that all of the Duets share a common design defect—the machines fail to clean properly their own mechanical components to eliminate soil and residue deposits known as "biofilm." The development of biofilm on mechanical parts in turn can lead to rapid growth of mold, mildew, and bacteria in places inside the machines that consumers cannot clean themselves.

Allison purchased a Whirlpool Duet HT® washing machine in 2005 and Glazer bought a Duet Sport® washing machine in 2006. Allison used high efficiency (HE) detergent in her washing machine, while Glazer used a reduced amount of regular detergent. Within six to eight months after their purchases, both plaintiffs noticed the smell of mold or mildew emanating from the machines and from laundry washed in the machines. Allison found mold growing on the sides of the detergent dispenser, and Glazer noticed mold growing on the rubber door seal. Although both plaintiffs allowed the machine doors to stand open as much as possible and also used ordinary household products to clean the parts of the machines they could reach, their efforts achieved only temporary relief from the pungent odors.

Allison contacted Whirlpool about the mold she found growing in the Duet. A company representative instructed her to use the washer's monthly cleaning cycle, add an Affresh™ tablet to the cleaning cycle, and manually clean under the rubber door seal. Allison followed this advice, but the problem persisted. She then contacted a service technician who examined the Duet. He could only advise Allison to leave the door open between laundry cycles to allow the machine to air-dry. Glazer also complained to Whirlpool about mold growing in the Duet she purchased. A company representative

advised her to switch from regular detergent to HE detergent and Glazer did so. She did not, however, utilize the Duet's cleaning cycle as recommended in Whirlpool's Use and Care Guide.

Both plaintiffs continued to experience mold growth in the Duets. Neither of them knew at the time of purchase that a Duet could develop mold or mildew inside the machine. If Whirlpool had disclosed this information, plaintiffs allege they would have made different purchasing decisions.

According to the evidence presented in support of the motion for class certification, the Duet® and Duet HT® front-loading washing machines are built on the "Access" platform, sharing nearly identical engineering. Although a few functions vary across the Duet models built on the "Access" platform, most model differences are aesthetic. The smaller-capacity Duet Sport® and Duet Sport HT® front-loading washing machines are built on the "Horizon" platform. With a few differences in function or styling, all Duet models built on the "Horizon" engineering platform are nearly identical. In addition, the "Access" and "Horizon" engineering platforms are also nearly identical to each other. The only two differences are that the "Access" platform is slightly larger than the "Horizon" and the "Access" platform is tilted a few degrees from the horizontal axis, while the "Horizon" platform is not. Front-loading machines are designed for use with HE detergent.

While all washing machines can potentially develop some mold or mildew after a period of use, front-loading machines promote mold or mildew more readily because of the lower water levels used and the higher moisture content within the machines, combined with reduced ventilation. Plaintiffs' expert witnesses, Dr. R. Gary Wilson, Whirlpool's former Director of Laundry Technology from 1976 to 1999, and Dr. Chin S. Yang, a microbiologist, opine that the common design defect in the Duets is their failure to clean or rinse their own components to remove soil residues on which fungi and bacteria feed, producing offensive odors. Dr. Wilson emphasized that the Duets fail to self-clean the back of the tub holding the clothes basket, the aluminum bracket used

to attach the clothes basket to the tub, the sump area, the pump strainer and drain hose, the door gasket area, the air vent duct, and the detergent dispenser duct.

Plaintiffs' evidence confirms that Whirlpool knew the designs of its "Access" and "Horizon" platforms contributed to residue buildup resulting in rapid fungal and bacterial growth. As early as September 2003, consumers began complaining to Whirlpool about the mold problem at the rate of two to three calls per day. When company representatives instructed the consumers to lift up the rubber door gaskets on their machines, common findings were deposits of water, detergent, and fabric softener, with concomitant growth of mold or mildew. Service technicians who examined consumers' Duets confirmed the existence of residue deposits and mold growing inside the machines. Whirlpool received complaints from numerous consumers who reported breathing difficulties after repair technicians scrubbed the Duets in their homes, releasing mold spores into the air.

In 2004 Whirlpool formed an internal team to analyze the mold problem and formulate a plan. In gathering information about the consumer complaints, Whirlpool engineers learned that both the "Access" and "Horizon" platforms were involved and the mold problem was not restricted to certain models or certain markets. Whirlpool's team also discovered that mold growth could occur before the Duets were two to four years old, that traditional household cleaners were not effective treatments, and that consumer laundry habits, including use of non-HE detergent, might exacerbate mold growth but did not cause it.

In a memorandum directed to other team members dated June 24, 2004, Anthony Hardaway, Whirlpool's Lead Engineer, Advance Chemistry Technology, wrote that mold growth in the Duets "occurs under all/any common laundry conditions" and "[d]ata to date show consumer habits are of little help since mold (always present) flourished under all conditions seen in the Access platform." R. 130-4. Hardaway further stated: "As both a biologist and a chemist this problem is very troubling in that we are fooling ourselves if we think that we can eliminate mold and bacteria when our HA wash platforms are the ideal environment for molds and bacteria to flourish. Perhaps we

should shift our focus to 'handling'/'controlling' mold and bacterial levels in our products." *Id.*

In public statements about mold complaints, Whirlpool adopted the term "biofilm" to avoid alarming consumers with words like "mold," "mildew," "fungi," and "bacteria." Although Whirlpool contemplated issuing a warning to consumers about the mold problem, plaintiffs' expert evidence indicates Whirlpool failed to warn the public adequately about the potential for mold growth in the Duets.

Later in 2004, Hardaway and other members of the Whirlpool team discussed redesign of the tub used on the "Horizon" platform because pooling of soil and water served as a nucleation site for mold and bacteria growth. They determined that the "Access" platform's webbed tub structure was extremely prone to water and soil deposits, and the aluminum basket cross-bar was highly susceptible to corrosion because of biofilm. A number of design factors contributed to this corrosion, including insufficient draining of water at the end of a wash cycle and water flowing backward through the non-return valve between the tub and the drain pump. Laboratory analyses confirmed that the composition of biofilm found in Duets built on the "Horizon" and "Access" platforms was identical. In light of these findings, Whirlpool made certain design changes to later generations of Duets.

By 2005, Whirlpool began manufacturing Duets with a special cycle intended to clean the internal parts of the machine. Engineers knew, however, that the new cleaning cycle would not remove all residue deposits. They were concerned that the cleaning cycle might not be effective to control mold growth and that consumers' use of bleach in the cleaning cycle—as recommended by Whirlpool in its consumer Use and Care Guides—would increase corrosion of aluminum machine parts. Internal Whirlpool documents acknowledged by this time that the available data indicated 35% of Duet customers had complained about odor in the Duets and that complaints continued to increase in all markets.

By March 2006 Whirlpool engineers recognized that consumers might notice black mold growing on the bellows or inside the detergent dispenser, and that laundry

would smell musty if a Duet was "heavily infected." By late 2006, Whirlpool had received over 1.3 million complaint calls at its customer care centers and had completed thousands of service calls nationwide.

Faced with increasing complaints about mold growth in Duets and fully aware that other brands were not immune from similar problems, Whirlpool decided to formulate new cleaning products for all front-loading washing machines, regardless of make or model. The company expected this "revolutionary" product to produce a new revenue stream of $50 million to $195 million based on the assumption that 50% percent of the 14 million front-loading washing machine owners of any brand might be looking for a solution to an odor problem with their machines.

In September 2007 Whirlpool introduced two new cleaning products to the retail market: Affresh™ tablets for front-loading washing machines in use from zero to twelve months, and Affresh™ tablets with six door seal cleaning cloths for front-loading washing machines in use more than twelve months. To encourage sales of these products, Whirlpool marketed Affresh™ as "THE solution to odor causing residue in HE washers." The company placed samples of Affresh™ in all new HE washing machines that it manufactured and changed its Use and Care Guides to advise consumers to use an Affresh™ tablet in the first cleaning cycle to remove manufacturing oil and grease. Whirlpool believed this advice would encourage consumers to use the cleaning cycle and Affresh™ tablets regularly—like teaching vehicle owners to change the oil in their cars periodically. Whirlpool instructed its service technicians and call centers to recommend the use of Affresh™ to consumers. But as plaintiff Allison learned from experience, even using Affresh™ tablets in the Duet's special cleaning cycle did not cure the mold problem.

Whirlpool shipped 121,033 "Access" platform Duet washing machines to Ohio from 2002 through March 2009. The company shipped 41,904 "Horizon" platform Duet Sport washing machines to Ohio during the period 2006 through March 2009.

In opposing the motion for class certification, Whirlpool asserted that most Duet owners have not experienced mold growth in their washing machines and that the

incidence of mold growth in the Duets is actually quite rare. As a result, consumers who have not experienced the mold problem cannot prove injury to establish Whirlpool's tort liability under Ohio law. The company also contended that class certification was inappropriate because the Duets were built on different platforms, representing twenty-one different models over a period of nine model years. According to Whirlpool, the plaintiffs must prove liability as to each separate model—a task that would defeat the class action prerequisites of commonality, predominance, and superiority. Whirlpool also emphasized that consumers' laundry habits and experiences with the Duets are so diverse that the named plaintiffs are not typical of the class; hence, they may not serve as class representatives. In support of these positions, Whirlpool presented deposition excerpts, affidavits from employees and satisfied Duet owners, expert reports, internal company documents, photographs, copies of Use and Care Guides, and various articles from Consumer Reports. Although Whirlpool requested and was granted permission to present live testimony at the class action certification hearing, the company ultimately did not present any testimony at the hearing.

After assimilating the extensive factual record and the parties' oral arguments on the motion to certify a class, the district court determined that the Rule 23(a) and (b)(3) prerequisites were met as to all issues of liability on plaintiffs' claims for tortious breach of warranty, negligent design, and negligent failure to warn. The court certified the following liability class:

> All persons who are current residents of Ohio and purchased a Washing Machine (defined as Whirlpool Duet®, Duet HT®, and Duet Sport® Front-Loading Automatic Washers) for primarily personal, family or household purposes, and not for resale, in Ohio, excluding (1) Whirlpool, any entity in which Whirlpool has a controlling interest, and its legal representatives, officers, directors, employees, assigns, and successors; (2) Washing Machines purchased through Whirlpool's Employee Purchase Program; (3) the Judge to whom this case is assigned, any member of the Judge's staff, and any member of the Judge's immediate family; (4) persons or entities who distribute or resell the Washing Machines; (5) government entities; and (6) claims for personal injury, wrongful death, and/or emotional distress.

The court declined to certify a class on plaintiffs' separate claim under the Ohio Consumer Sales Practice Act, and that claim is not before us. Whirlpool promptly appealed the district court's order certifying the liability class.

## III. ANALYSIS

### A.    Standard of Review

A district court has broad discretion to decide whether to certify a class. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). This court has described its appellate review of a class certification decision as "narrow," *Davis v. Cintas Corp.*, No. 10-1662, 2013 WL 2343302, at *5 (6th Cir. May 30, 2013), and as "very limited." *Olden v. LaFarge Corp.*, 383 F.3d 495, 507 (6th Cir. 2004). We will reverse the class certification decision in this case only if Whirlpool makes a strong showing that the district court's decision amounted to a clear abuse of discretion. *See Olden*, 383 F.3d at 507. "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012) (citing *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 629 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 1757 (2012)). We will not find an abuse of discretion unless we reach a "definite and firm conviction" that the district court "committed a clear error of judgment." *See id.* (citation and internal quotation marks omitted).

### B.    The Class Action Certification

#### 1. The requirements of Rule 23(a) and (b)(3)

We must begin our analysis with a recognition that the "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To obtain class certification, the plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These four requirements—numerosity, commonality, typicality, and adequate representation—serve to limit class claims to those that are fairly encompassed within the claims of the named plaintiffs because class representatives must share the same interests and injury as the class members. *Dukes*, 131 S. Ct. at 2550.

In addition to fulfilling the four prerequisites of Rule 23(a), the proposed class must also meet at least one of the three requirements listed in Rule 23(b). *Dukes*, 131 S. Ct. at 2548; *Young*, 693 F.3d at 537. The plaintiffs sought class certification under Rule 23(b)(3), which requires the district court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members" and that the class action is "superior to other available methods" to adjudicate the controversy fairly and efficiently. The plaintiffs carry the burden to prove that the class certification prerequisites are met, *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079, and the plaintiffs, as class representatives, were required to establish that they possess the same interest and suffered the same injury as the class members they seek to represent. *Dukes*, 131 S. Ct. at 2550.

### 2. *Consideration of the merits at the class certification stage*

Class certification is appropriate if the court finds, after conducting a "rigorous analysis," that the requirements of Rule 23 have been met. *Dukes*, 131 S. Ct. at 2551; *Young*, 693 F.3d at 537; *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). Ordinarily, this means that the class determination should be predicated on evidence presented by the parties concerning the maintainability of the class action. *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079. On occasion "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *Gen. Tele. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982), and "rigorous analysis" may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims. *Dukes*, 131 S. Ct. at 2551.

There is nothing unusual about "touching aspects of the merits in order to resolve preliminary matters . . . [because doing so is] a familiar feature of litigation." *Id.* at 2552. But permissible inquiry into the merits of the plaintiffs' claims at the class certification stage is limited:

> Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

*Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) (citing *Dukes*, 131 S. Ct. at 2552 n.6 (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974)).

Whirlpool asserts that the district court inappropriately relied on *Eisen* to avoid deciding on the merits several questions of fact arising from the evidence presented by the parties in connection with the motion to certify a class. In *Eisen*, the Supreme Court expressed the view that "nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen*, 417 U.S. at 177. This court interpreted *Eisen* to mean that "Rule 23 does not *require* a district court, in deciding whether to certify a class, to inquire into the merits of the plaintiff's suit." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 560 (6th Cir. 2007)(emphasis added).

The Supreme Court's recent opinions in *Amgen* and *Dukes* now clarify that some inquiry into the merits may be necessary to decide if the Rule 23 prerequisites are met. *Amgen*, 133 S. Ct. at 1194–95; *Dukes*, 131 S. Ct. at 2551–52. *Amgen*, however, admonishes district courts to consider at the class certification stage only those matters relevant to deciding if the prerequisites of Rule 23 are satisfied. *See Amgen*, 133 S. Ct. at 1194–95. In other words, district courts may not "turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012).

Though the district court below, acting in 2010, referenced the *Eisen* language that a merits inquiry is not *required* to decide class certification, we are satisfied that the court considered relevant merits issues with appropriate reference to the evidence.   The record contained extensive material including: numerous corporate documents; extensive affidavits from the parties' experts and witnesses; Whirlpool's successful evidentiary motion practice; and the court's grant of Whirlpool's motion to present live testimony at the class certification hearing—a right that Whirlpool subsequently chose not to exercise.  After reviewing the factual record and entertaining oral argument, the district court considered merits issues relevant in deciding whether the plaintiffs met the Rule 23 prerequisites for class certification.  *See Amgen*, 133 S. Ct. at 1194–95.  The court denied certification on one legal claim then certified only a liability class on the remaining legal claims, reserving all damages questions for individual determination. By sifting the abundant evidence through the sieve of  the legal claims, the court satisfied the requirement to perform a "rigorous analysis."  *Dukes*, 131 S. Ct. at 2551; *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 418 (6th Cir. 2012) (rejecting similar argument and concluding the district court "probed behind the pleadings, considering all of the relevant documents that were in evidence").  Consequently, we turn to our review of the court's findings on the four Rule 23(a) factors.

### 3.  Plaintiffs' proof on the Rule 23(a) prerequisites

#### a.  Numerosity

Whirlpool mounts no specific challenge to the potential size of the class.  While no strict numerical test exists to define numerosity under Rule 23(a)(1), "substantial" numbers of affected consumers are sufficient to satisfy this requirement.  *Daffin*, 458 F.3d at 552.  Whirlpool shipped thousands of Duets to Ohio for retail sale.  Evidence of these shipments to retailers is sufficient to show numerosity of a class consisting of all Ohio residents who purchased a Duet in Ohio primarily for personal, family or household purposes.  *See id.*

### b. Commonality, typicality, and fair representation

The central issues in this appeal spring from the remaining prerequisites of Rule 23.  A class action may be maintained if "there are questions of law or fact common to the class" and the plaintiffs' claims "are typical of the claims . . . of the class."  Fed. R. Civ. P. 23(a)(2) & (a)(3).

To demonstrate commonality, plaintiffs must show that class members have suffered the same injury.  *Dukes*, 131 S. Ct. at 2551.  "Their claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  This inquiry focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit.  *Id.*

Typicality is met if the class members' claims are "fairly encompassed by the named plaintiffs' claims."  *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (en banc) (quoting *In re Am. Med. Sys.*, 75 F.3d at 1082)).  This requirement insures that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members.  *Id.*

These two concepts of commonality and typicality "tend to merge" in practice because both of them "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Dukes*, 131 S. Ct. at 2551 n.5.  In addition, commonality and typicality tend to merge with the requirement of adequate representation, although the latter factor also brings into play any concerns about the competency of class counsel and any conflicts of interest that may exist.  *Id.*  Due to the intertwined nature of commonality, typicality, and adequate representation, we consider them together.

We start from the premise that there need be only one common question to certify a class.  *See Sprague,* 133 F.3d at 397.  Here the district court identified two primary questions that will produce in one stroke answers that are central to the validity of the plaintiffs' legal claims:  (1) whether the alleged design defects in the Duets proximately cause mold or mildew to develop in the machines and (2) whether Whirlpool adequately warned consumers who purchased Duets about the propensity for mold growth in the machines.  A quick review of the elements of plaintiffs' legal claims under Ohio law explains why the district court found these two questions common to all members of the liability class.

To prevail on a claim for tortious breach of warranty (also known in Ohio as strict liability or breach of implied warranty), the plaintiffs must prove that (1) a defect existed in the product manufactured and sold by the defendant; (2) the defect existed at the time the product left the defendant's hands; and (3) the defect directly and proximately caused the plaintiff's injury or loss.  *Temple v. Wean United, Inc.*, 364 N.E.2d 267, 270 (Ohio 1977); *State Auto. Mut. Ins. Co. v. Chrysler Corp.*, 304 N.E.3d 891, 895 (Ohio 1973).  *See also Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 902 (6th Cir. 2004) (observing that breach of implied warranty claim is nearly indistinguishable from design defect claim under Ohio Product Liabilities Act (OPLA)).  To prove a claim of negligent design, the plaintiffs must show:  (1) a duty to design against reasonably foreseeable hazards; (2) breach of that duty; and (3) injury proximately caused by the breach.  *Briney v. Sears, Roebuck & Co.*, 782 F.2d 585, 587 (6th Cir. 1986) (applying Ohio law).  To prove a claim of negligent failure to warn, the plaintiffs must establish:  (1) the manufacturer had a duty to warn; (2) the duty was breached; and (3) the plaintiff's injury proximately resulted from the breach of duty.  *Hanlon v. Lane*, 648 N.E.2d 26, 28 (Ohio Ct. App. 1994).  As to the latter claim, the plaintiffs must show "that in the exercise of ordinary care, the manufacturer knew or should have known of the risk or hazard about which it failed to warn" and "that the manufacturer failed to take the precautions that a reasonable person would have taken in presenting the product to the public."  *Doane v. Givaudan Flavors Corp.*, 919 N.E.2d 290, 296 (Ohio Ct. App. 2009).

The claims for tortious breach of warranty and negligent design rise or fall on whether a design defect proximately causes mold or mildew to develop in the Duets. Success on the negligent failure-to-warn claim depends on whether Whirlpool had a duty to warn consumers about the propensity for mold growth in Duets and breached that duty. The district court correctly ruled that these two central questions are common to the entire liability class.

Whirlpool claims that commonality is defeated because the Duets were built over a period of years on two different platforms, resulting in the production of twenty-one different models during the relevant time frame. While the trial evidence may concern different Duet models built on two different platforms, the common question of whether design defects cause mold growth remains across the manufacturing spectrum Whirlpool describes. Plaintiffs' evidence—some of which comes directly from internal documents authored by Whirlpool's own Lead Engineer of Advance Chemistry Technology, Andrew Hardaway—confirms that the two platforms are nearly identical, the design issues concerned various models, and most of the differences in models were related to aesthetics, not design.[1] Whether the alleged design defects caused biofilm and mold to accumulate in the Duets is a common issue for all members of the certified class.

The Seventh Circuit agreed with this point when it reversed the denial of class certification in a similar case challenging alleged design defects in Sears Kenmore brand front-loading washing machines manufactured by Whirlpool. *See Butler v. Sears, Robuck & Co.*, 702 F.3d 359, 361 (7th Cir. 2012), *cert. granted*, *judgment vacated*, *Sears, Roebuck & Co. v. Butler*, 2013 WL 775366 (U.S. June 3, 2013) (No. 12-1067).[2] That court stated: "The basic question in the litigation—were the machines defective in permitting mold to accumulate and generate noxious odors?—is common to the entire mold class, although the answer may vary with the differences in design. The individual

---

[1] Although Hardaway subsequently provided Whirlpool with affidavits attempting to change or clarify prior statements he made in internal company documents addressed to team members working on the mold problem, his credibility is ultimately an issue for the jury to determine.

[2] As in this case, the Supreme Court granted certiorari and remanded the case to the Seventh Circuit for reconsideration in light of *Comcast Corp.*

questions are the amount of damages owed particular class members (the owners of the washing machines)." *Id.* This reasoning is consistent with our own that "[n]o matter how individualized the issue of damages may be," determination of damages "may be reserved for individual treatment with the question of liability tried as a class action," *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988), a course the district court followed here.

Whirlpool next asserts that consumer laundry habits vary widely by household; therefore, proof of proximate cause must be determined individually for each plaintiff in the class. The record indicates otherwise. Whirlpool's own documents confirmed that its design engineers knew the mold problem occurred despite variations in consumer laundry habits and despite remedial efforts undertaken by consumers and service technicians to ameliorate the mold problem. Plaintiffs' expert, Dr. Gary Wilson, Whirlpool's own former Director of Laundry Technology, opined that consumer habits and home environments could influence the amount of biofilm in the Duets, but those factors are not the underlying cause of biofilm. Whirlpool challenges Dr. Wilson's testimony on the ground that he did not evaluate later design changes to the Duets to see if those changes rectified the mold problem. Dr. Wilson acknowledged that Whirlpool made changes to the "Access" platform tub design, but found that other areas of the machines built on the "Access" platform continued to collect biofilm. In addition, he examined a later-generation Duet Sport built on the "Horizon" platform and found that it was still manufactured with cavities on the side of the tub exposed to water, increasing the likelihood of biofilm collection. Even removing those cavities, he explained, would not completely eliminate the biofilm problem because of other design defects. *See Samuel-Bassett v. KIA Motors Am., Inc.*, 34 A.3d 1, 22–24 (Pa. 2011) (rejecting claim that design changes defeated commonality and predominance where modifications did not significantly alter the basic defective design).

Because the evidence confirms that the issues regarding alleged design flaws are common to the class, this case is similar to *Daffin*, where the Ohio plaintiff class alleged that a defective throttle body assembly installed in two different model years of minivans

caused the accelerators to stick. *Daffin*, 458 F.3d at 550. Class certification was appropriate because proof could produce a common answer about whether the automotive part was defective. *Id.* Likewise, proof in this case will produce a common answer about whether the alleged design defects in the Duets proximately caused mold or mildew to grow in the machines. Common proof will advance the litigation by resolving this issue "in one stroke" for all members of the class. *See Dukes*, 131 S. Ct. at 2551.

Whirlpool relies on *In re American Medical Systems*, which is distinguishable from this case. There the commonality prerequisite was not satisfied because plaintiffs did not allege any particular defect common to all plaintiffs where at least ten different prosthetic implant models had been modified over the years. *In re Am. Med. Sys.*, 75 F.3d at 1080–81. Not only were the unique individual medical histories of the plaintiffs at issue, but proof varied widely among the plaintiffs concerning medical complications resulting from the implanted devices. *Id.* at 1081. The individual injuries could be attributed to such wide-ranging factors as surgical error, anatomical incompatibility, and infection. *Id.* Because of these distinguishing circumstances, *In re American Medical Systems* does not control this case.

Whirlpool next contends that the certified class is too broad because it includes Duet owners who allegedly have not experienced a mold problem and are pleased with the performance of their Duets. Satisfied consumers lack anything in common with consumers who may have misused their machines and complain of a mold problem, Whirlpool argues; furthermore, Glazer and Allison are atypical of satisfied consumers and cannot represent them. Our precedent indicates otherwise.

The existence of currently satisfied Duet owners in Ohio did not preclude the district court from certifying the Ohio class. In *Daffin*—also an Ohio defective product case—we affirmed class certification, holding: "Although the class includes those owners who never actually experienced a manifestation of the alleged defect, the class certification was not an abuse of discretion because the class and the named plaintiff meet the elements of Federal Rule of Civil Procedure 23(a) and 23(b)(3)." *Daffin*,

458 F.3d at 550.  After determining that all the class members claimed the delivery of a good that did not conform to defendant's warranty, we turned to Rule 23(b)(3).  We concluded that three common questions—whether the part at issue was defective; whether that defect reduced the value of the car; and whether defendant's warranty covered the latent defect—predominated, prompting us to affirm certification of a class of all vehicle owners.  *Id.* at 554.  Thus, *Daffin* supports our determinations under Rule 23(a) and those further discussed below under Rule 23(b)(3).

Finally, Whirlpool contends that the plaintiffs did not raise below a "premium price" theory of recovery, but even if they did, Ohio law does not allow pursuit of such a theory.  The evidentiary record and Ohio law convinces us that these arguments are without merit.

The plaintiffs alleged on behalf of all Duet owners that Whirlpool impliedly warranted that the Duets were of good and merchantable quality, both fit and safe for their ordinary intended use.  R. 80, Third Amended Master Class Action Complaint ¶ 131, Page ID 1640.  Because of the alleged design defects and

> [a]s a direct and proximate result of Whirlpool's warranty breach, the Ohio Plaintiffs and the other members of the Ohio Class were caused to suffer *loss attributable to the decreased value of the product itself*, and consequential damages—losses sustained by the purchase of the defective product—and the Ohio Plaintiffs and the other members of the Ohio Class will have to spend monies to repair and/or replace the washers.

*Id.* ¶ 134, Page ID 1640 (emphasis added).  The plaintiffs further alleged that Whirlpool owed a duty to class members "to exercise ordinary and reasonable care to properly design" the Duets and that Whirlpool "had a pre-sale duty to warn potential purchasers that the [Duets] carried with them greater risks of foul [odors] and health hazards than an ordinary consumer would expect when using the [Duets] in their intended or reasonably-foreseeable manner."  *Id.* ¶¶ 140–41, Page ID 1641.

Plaintiffs' counsel repeated this theme as he opened oral argument in the district court on the motion to certify a class.  After disclosing the prices Glazer and Allison paid

for their Duets, counsel contended that both plaintiffs "paid a premium for their Whirlpool washers. Both of them experienced foul smells from their machines within the first year." R. 134 Page ID 4777. When the court asked whether there would be any problem in defining the class to include Duet owners who have not had any particular problems with their machines, plaintiffs' counsel replied that "[h]ere everybody owns the washer that has the same defect and the same problem" although "not everyone, as yet, has necessarily had the odor problem." *Id.* at 4778–79. Counsel cited *Daffin* to support class certification where that class included "those owners who never experienced a manifestation of the alleged defect." *Id.* at 4780. Based on *Daffin*, the district court properly included all Duet owners in the class. If defective design is ultimately proved, all class members have experienced injury as a result of the decreased value of the product purchased. The remedy for class members who purchased Duets at a premium price but have not experienced a mold problem can be resolved through the individual determination of damages as the district court determined.

As to the legal component of Whirlpool's argument, the Ohio cases may not use the phrase "premium price theory of recovery." But Ohio law permits ordinary consumers who are not in privity of contract with product manufacturers to bring claims such as negligent design and negligent failure-to-warn in order to recover damages for economic injury only, as the district court exhaustively explained when it denied Whirlpool's motion to dismiss the Ohio tort claims under Federal Rule of Civil Procedure 12(b)(6). *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 684 F. Supp. 2d 942, 949–51 (N.D. Ohio Nov. 3, 2009) (and numerous Ohio state and federal cases cited therein).

Because *all* Duet owners were injured at the point of sale upon paying a premium price for the Duets as designed, even those owners who have not experienced a mold problem are properly included within the certified class. Moreover, under the negligent failure-to-warn theory of liability, the plaintiffs need not prove that mold manifested in every Duet owned by class members because the injury to all Duet owners occurred when Whirlpool failed to disclose the Duets' propensity to develop biofilm and mold

No. 10-4188          *Glazer, et al. v. Whirlpool Corp.*                    Page 22

growth. *See Tait v. BSH Home Appliance Corp.*, 289 F.R.D. 466, 479 (C.D. Cal. 2012) (discussing similar point-of-sale argument when certifying a class where plaintiffs alleged defective design of front-loading washing machines caused development of biofilm and mold).

Circuit cases support our conclusion. In *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010), a car manufacturer successfully argued before the district court that class certification was inappropriate because the named class plaintiffs did not prove that an alignment geometry defect causing premature tire wear manifested in a majority of the class members' vehicles. The Ninth Circuit reversed and remanded for class certification, holding that "proof of the manifestation of a defect is not a prerequisite to class certification[,]" and that "individual factors may affect premature tire wear, [but] they do not affect whether the vehicles were sold with an alignment defect." *Id.  See also Tait*, 289 F.R.D. at 479 (citing *Wolin* and our prior opinion in this case to reject an argument that all class members must show actual manifestation of biofilm in front-loading washing machines to permit class certification). Similarly, in *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011), the appellate court concluded that the plaintiff class sufficiently established injury for standing purposes by showing that "[e]ach alleged class member was relieved of money in the transactions." These persuasive authorities support our conclusion under Ohio law that not all class members must demonstrate manifestation of biofilm and mold growth in their Duets before those individuals may be included in the certified class.

If Whirlpool can prove that most class members have not experienced a mold problem and that it adequately warned consumers of any propensity for mold growth in the Duets, then Whirlpool should welcome class certification. By proving that the Duets are not defectively designed and that no warnings were needed (or if they were, that adequate warnings were issued to consumers), Whirlpool can obtain a judgment binding all class members who do not opt out of the class.

In summary, the trial of common questions will evoke common answers likely to drive resolution of this lawsuit. *See Dukes*, 131 S. Ct. at 2551. Plaintiffs Glazer and Allison are typical of class members and they, with leadership of their class counsel, will fairly represent the class. The named plaintiffs purchased Whirlpool Duets, believing them to be of good and merchantable quality, fit and safe for their ordinary intended use. Like all Ohio Duet owners, Glazer and Allison used the washing machines for their intended use and in a reasonably-foreseeable manner. The Duets Glazer and Allison purchased developed mold growth despite differences in their laundry habits and despite the efforts of service technicians to abate the mold problem. Thus, Glazer and Allison will adequately represent other Duet owners whose machines similarly developed the mold problem. They will also fairly represent those Duet purchasers who have not yet experienced a mold problem. Plaintiffs alleged and argued below that *all* Duet owners suffered injury immediately upon purchase of a Duet due to the design defect in, and the decreased value of, the product itself, whether mold causing additional consequential damages has yet manifested or not.

For these reasons, the district court did not abuse its discretion in ruling that the Rule 23(a) prerequisites of numerosity, commonality, typicality, and adequate representation are satisfied for certification of a liability class only.

### 4. The Rule 23(b)(3) prerequisites: predominance and superiority

This brings us to the plaintiffs' showing on the Rule 23(b)(3) requirements of predominance and superiority. The analyses in many of the cases discussed above confirm the presence of predominance and superiority in this case, but two recent governing Supreme Court cases on predominance and superiority seal our conviction that this is so: *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184 (2013), and *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). An orderly analysis begins with examination of *Amgen*, followed by *Comcast Corp.*, which was decided one month later.

In *Amgen*, the Supreme Court affirmed certification of a class in a securities fraud case brought under § 10(b) and Rule 10b-5 premised on the fraud-on-the-market

theory of liability.  *Id.* at 1190, 1194, 1204.  Amgen did not dispute that Connecticut Retirement met all four of the class action prerequisites of Rule 23(a); the case focused on the Rule 23(b)(3) predominance inquiry.  *Id.* at 1190–91.  Amgen contended that, to demonstrate predominance and insure class certification, Connecticut Retirement was required to prove, not plausibly plead, a central element of its case:  the materiality of Amgen's alleged misrepresentations or omissions.  *Id.* at 1191.  The Supreme Court responded to Amgen's position with this holding:

> While Connecticut Retirement certainly must prove materiality to prevail on the merits, we hold that such proof is not a prerequisite to class certification.  Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.  Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class Connecticut Retirement would represent.

*Id.* at 1191.  The Court repeatedly emphasized that the predominance inquiry must focus on common questions that can be proved through evidence common to the class.  *Id.* at 1195–96.  A plaintiff class need not prove that each element of a claim can be established by classwide proof:  "What the rule does require is that common questions '*predominate* over any questions affecting only individual [class] members.'"  *Id.* at 1196.

The Court further explained in *Amgen* that an inability of the plaintiff class "to prove materiality would not result in individual questions predominating.  Instead, a failure of proof on the issue of materiality would end the case, given that materiality is an essential element of the class members' securities-fraud claims."  *Id.* at 1191.  The plaintiff class before the Court was "entirely cohesive:  It will prevail or fail in unison. In no event will the individual circumstances of particular class members bear on the inquiry."  *Id.*  For this reason, the Court rejected Amgen's contention that, under Rule 23(b)(3), "Connecticut Retirement must first establish that it will win the fray. . . . [T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and

efficiently.'" *Id.* Class adjudication in these circumstances is more efficient, the Court also explained, because it avoids a "mini-trial" at certification that if successful must be repeated at trial or if unsuccessful frees the non-named class members to multiply the litigation. *Id.* at 1201.

Following *Amgen*'s lead, we uphold the district court's determination that liability questions common to the Ohio class—whether the alleged design defects in the Duets proximately caused mold to grow in the machines and whether Whirlpool adequately warned consumers about the propensity for mold growth—predominate over any individual questions. As in *Amgen*, the certified liability class "will prevail or fail in unison," *id.* at 1191, for all of the same reasons we discussed above in conjunction with the Rule 23(a) prerequisites of commonality and typicality. Rule 23(b)(3) does not mandate that a plaintiff seeking class certification prove that each element of the claim is susceptible to classwide proof. *Id.* at 1196. Evidence will either prove or disprove as to all class members whether the alleged design defects caused the collection of biofilm, promoting mold growth, and whether Whirlpool failed to warn consumers adequately of the propensity for mold growth in the Duets. *See id.*; *Young*, 693 F.3d at 544; *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352–54 (6th Cir. 2011).

Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient for decision-making. *See Amgen*, 133 S. Ct. at 1197. Instead, Whirlpool points to "a fatal similarity—[an alleged] failure of proof as to an element of the plaintiffs' cause of action." *Id.* (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 107 (2009)). That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class." *Id.* Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones. Simply put, this case comports with the "focus of the predominance inquiry"—it is "sufficiently cohesive to warrant adjudication by

representation." *Id.* at 1196 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

The Supreme Court's subsequent decision in *Comcast Corp.* further instructs us on the necessary predominance inquiry, but after carefully considering the precepts discussed there, we conclude that the case does not change the outcome of our Rule 23 analysis. We explain why.

In *Comcast Corp.*, the district court certified a liability *and* damages class under Rules 23(a) & (b)(3) comprised of more than two million current and former Comcast subscribers who sought damages for alleged violations of federal antitrust laws. 133 S. Ct. at 1429–31. Although the plaintiffs proposed four different theories of antitrust impact, the district court found that only one could be proved in a manner common to all class plaintiffs: the theory that "Comcast engaged in anticompetitive clustering conduct, the effect of which was to deter the entry of overbuilders in the Philadelphia" Designated Market Area (DMA). *Id.* at 1430–31 & n.3.

The plaintiffs' expert calculated damages for the entire class using a model that failed to isolate the damages resulting from the one theory of antitrust impact the district court had allowed to proceed. *Id.* The court nonetheless certified the class, finding that the damages related to the allowed theory could be calculated on a classwide basis. *Id.* at 1431. The Third Circuit affirmed. *Id.*

The Supreme Court reversed in a decision that it described as turning "on the straightforward application of class-certification principles." *Id.* at 1433. Because the plaintiffs would be entitled to damages resulting only from the allowed liability theory if they were to prevail on the merits, the Court instructed that the "model purporting to serve as evidence of damages . . . must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 1433.

Neither the Third Circuit nor the district court had required the plaintiffs to link each liability theory to a damages calculation because, those courts reasoned, doing so would necessitate inquiry into the merits, which had no place in the class certification decision. *Id.* The Supreme Court rejected that analysis as contradictory to *Dukes*, 131 S. Ct. at 2551–52 & n.6, and as improperly permitting plaintiffs to offer any method of damages measurement, no matter how arbitrary, at the class-certification stage, thereby reducing the predominance requirement of Rule 23(b)(3) "to a nullity." *Comcast Corp.*, 133 S. Ct. at 1433. Due to the model's inability to distinguish damages attributable to the allowed theory of liability, the Court ruled that the predominance prerequisite of Rule 23(b)(3) did not warrant certification of a class. *Id.* at 1435. Accordingly, the Court reversed the certification order. *Id.*

This case is different from *Comcast Corp.* Here the district court certified only a liability class and reserved all issues concerning damages for individual determination; in *Comcast Corp.* the court certified a class to determine both liability and damages. Where determinations on liability and damages have been bifurcated, *see* Fed. R. Civ. P. 23(c)(4), the decision in *Comcast*—to reject certification of a liability and damages class because plaintiffs failed to establish that damages could be measured on a classwide basis—has limited application. To the extent that *Comcast Corp.* reaffirms the settled rule that liability issues relating to injury must be susceptible of proof on a classwide basis to meet the predominance standard, our opinion thoroughly demonstrates why that requirement is met in this case. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (observing after *Comcast* that class "must be able to show that their damages stemmed from the defendant's actions that created the legal liability").

Accordingly, the principles we glean from *Amgen* and *Comcast Corp.* include that to satisfy Rule 23(b)(3), named plaintiffs must show, and district courts must find, that questions of law or fact common to members of the class predominate over any questions that affect only individual members. *Amgen*, 133 S. Ct. at 1195–96; *Comcast Corp.*, 133 S. Ct. at 1433. Both cases are premised on existing class-action jurisprudence. The majority in *Comcast Corp.* concludes that the case "turns on the

straightforward application of class certification principles," 133 S. Ct. at 1433, and the dissent concurs that "the opinion breaks no new ground on the standard for certifying a class action under Federal Rule of Civil Procedure 23(b)(3)," *id.* at 1436. The dissent notes other class action principles that remain unchanged. "[W]hen adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied even if damages are not provable in the aggregate." *Id.* at 1437. A class may be divided into subclasses, Fed. R. Civ. P. 23(c)(4)–(5), or, as happened in this case, "a class may be certified for liability purposes only, leaving individual damages calculations to subsequent proceedings." *Id.* at 1437 n.*. Because "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal," *id.* at 1437 (citing, among other cases, *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564–66 (6th Cir. 2007)), in "the mine run of cases, it remains the 'black letter rule' that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members." *Id.*

Thus, read in light of *Amgen, Comcast Corp.*, *Daffin*, and other cases we have discussed, the evidence and the district court's opinion convince us that class certification is the superior method to adjudicate this case fairly and efficiently. *See Amgen*, 133 S. Ct. at 1191; *Olden*, 383 F.3d at 507–10. Use of the class method is warranted particularly because class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery. *See Amgen*, 133 S. Ct. at 1202; *Amchem Prods., Inc.*, 521 U.S. at 617 (finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'"); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (noting that "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits" because of litigation costs). As the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(c)(2)(B)(v).

Once the district court resolves under Ohio law the common liability questions that are likely to generate common answers in this case, the court will either enter judgment for Whirlpool or proceed to the question of plaintiffs' damages.  In the latter event, the court may exercise its discretion in line with *Amgen*, *Comcast Corp.*, and other cases cited in this opinion to resolve the damages issues.

## IV.  CONCLUSION

In summary, we uphold, under our prescribed narrow review, the district court's determination that the Rule 23(a) and (b)(3) class certification prerequisites were met. Plaintiffs established numerosity, commonality, typicality, and adequate representation. In addition, they showed that common questions predominate over individual ones and that the class action is the superior method to adjudicate Whirlpool's liability on the legal claims.  Because the district court did not clearly abuse its discretion in certifying a class on the issue of liability only, we **AFFIRM**.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on July 19, 2013, a true and correct copy of the

foregoing document was served via ECF upon the following counsel of record:

> Thomas A. Casey, Jr.
> Richard J. Tyler
> Tracy E. Kern
> David Theard
> JONES, WALKER, WAECHTER, POITEVANT,
> CARRÈRE & DÈNEGRE, LLP
> 201 St. Charles Avenue, 49th Floor
> New Orleans, LA 70170
> (504) 582-8266 (telephone)
> (504) 589-8266 (fax)
> tcaseyjr@joneswalker.com
> rtyler@joneswalker.com
> tkern@joneswalker.com
> dtheard@joneswalker.com
>
> Laurie M. Chess
> JONES, WALKER, WAECHTER, POITEVANT,
> CARRÈRE & DÈNEGRE, LLP
> 201 S. Biscayne Blvd., Suite 2600
> Miami, Florida 33131
> (305) 679-5278 (telephone)
> (305) 679-5710 (fax)
> lchess@joneswalker.com
>
> *Attorneys for Defendants*


      Cyrus Mehri                 
Cyrus Mehri